UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
THOMAS A. WILLIAMS and
ROBIN E. PELLEGRINI,

                Plaintiffs,

   - against -

COUNTY OF NASSAU, NASSAU COUNTY
CIVIL SERVICE COMMISSION, THOMAS R.
SUOZZI, *in his official and individual capacities*,
JOHN J. SENKO, JR., *in his official and individual
capacities*, JAMES F. DEMOS, *in his official and
individual capacities*, DAVID J. GUGERTY, *in his
official and individual capacities*, ANTHONY M.
CANCELLIERI, *in his official and individual
capacities*, JOHN DONNELLY, *in his official and
individual capacities*, PETER SYLVER, *in his
official and individual capacities*, BRUCE
NYMAN, *in his official and individual capacities*,
and PATRICIA BOURNE, *in her official and
individual capacities*,

                Defendants.
----------------------------------------------------------X

**MEMORANDUM & ORDER**
03-CV-6337 (RRM)(ETB)

**MAUSKOPF, United States District Judge.**

      Defendants, the County of Nassau, the Nassau County Civil Service Commission, Thomas R. Suozzi, John J. Senko, Jr., James F. Demos, David J. Gugerty, Anthony M. Cancellieri, John Donnelly, Peter Sylver, Bruce Nyman, and Patricia Bourne (together, "Defendants"), move for reconsideration pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) and Local Rule 6.3 of this Court's January 22, 2010 Memorandum and Order denying their motion for summary judgment as to Plaintiffs Thomas Williams and Robin Pellegrini's (together, "Plaintiffs") First Amendment retaliation claims. For the reasons set forth below, Defendants' motion is DENIED as to Pellegrini and GRANTED as to Williams. Accordingly, Williams' claims of First Amendment retaliation are DISMISSED.

**BACKGROUND**[1]

Plaintiffs commenced this civil rights action on December 18, 2003. (Doc. No. 1.) They asserted numerous causes of action against the County of Nassau, the Nassau County Civil Service Commission ("CSC"), and the Office of Housing and Intergovernmental Affairs ("OHIA"), as well as various individuals in both their official and individual capacities. Plaintiffs amended their Complaint on February 18, 2004. (Doc. No. 19.)

On March 31, 2005, Judge Feuerstein dismissed a number of Plaintiffs' claims. (Doc. No. 61.) On December 26, 2007, Defendants moved for summary judgment on the remaining six causes of action, (Doc. No. 126), and this Court referred that motion to Magistrate Judge E. Thomas Boyle on November 12, 2008. On February 2, 2009, Judge Boyle issued a Report and Recommendation (the "R&R") that summary judgment should be granted in favor of Defendants as to all claims, except Plaintiffs' First Amendment retaliation claims. (Doc. No. 143.) On January 22, 2010, this Court adopted the R&R in its entirety. (Doc. No. 151.) Accordingly, the following claims were dismissed: (1) Williams' conspiracy claim brought pursuant to 42 U.S.C. § 1983 (second cause of action); (2) Pellegrini's claim of race and color discrimination brought pursuant to Title VII, 42 U.S.C. §§ 2000e *et seq.* (first cause of action); (3) Pellegrini's age discrimination claim brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623 (fourth cause of action); and (4) Plaintiffs' whistleblower claims brought pursuant to the New York State Civil Service Law § 75-b (sixth cause of action). Additionally, the Court dismissed Defendant OHIA from the case.

The Court denied Defendants' motion for summary judgment as to Williams' and Pellegrini's claims of First Amendment retaliation (the second and third causes of action).

---

[1] The underlying facts and procedural history of this case are set forth in greater detail in Judge Boyle's February 2, 2009 Report and Recommendation. (Doc. No. 143.) This Court discusses only those facts relevant to the instant motion for reconsideration.

2

Defendants now move for reconsideration of that portion of the decision pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) and Local Rule 6.3. Defendants argue that Pellegrini's First Amendment retaliation claims should be dismissed because the R&R overlooked the causal element of a prima facie case for retaliation. Further, Defendants argue that the Second Circuit's opinion in *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010), which was decided after this Court adopted the R&R, changes the analysis of whether Williams spoke as a citizen or in his official capacity as Executive Director of the CSC.

## STANDARD OF REVIEW

The standard for making a successful motion for reconsideration is stringent, "and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted); *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (citations and internal quotation marks omitted)). A motion for reconsideration is not an opportunity to relitigate claims that have already been adjudicated. *See Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d. Cir. 1998) (stating that a motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple" (citation and internal quotation marks omitted)); *Davidson v. Scully*, 172 F. Supp. 2d 458, 461– 62 (S.D.N.Y. 2001) (explaining that motions for reconsideration brought pursuant to Local Rule 6.3 must be "narrowly construed and strictly applied so as to avoid repetitive arguments on

issues that have been considered fully by the Court," and may not be used to advance new facts, issues, or arguments not previously presented to the court (citation and internal quotation marks omitted)).

## **DISCUSSION**

1. Timeliness

Plaintiffs first argue that Defendants' motion for reconsideration must be denied as untimely. (Pls.' Mem. of Law in Opp. to Mot. for Recons. ("Pls.' Br.") at 2.) It is true that Defendants filed their motion for reconsideration beyond the time-limits prescribed by Federal Rules of Civil Procedure 60(b) and 59(e), and Local Rule 6.3. Plaintiffs' argument, however, ignores a fundamental principle. A district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal. *See* Fed. R. Civ. P. 54(b); *see also Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 217 F. Supp. 2d 423, 428 (S.D.N.Y. 2002). Moreover, this Court, fully aware of the Second Circuit's decision in *Weintraub*, invited reconsideration and additional briefing, thereby extending the time-limit imposed by Local Rule 6.3, which establishes the only ground available for Defendants to move for reconsideration of this Court's interlocutory Order.[2] *See Lichtenberg v. Besicorp Grp. Inc.*, 204 F.3d 397, 403–04

---

[2] Neither Rule 60(b) nor Rule 59(e) applies to this motion for reconsideration, and it is properly brought pursuant to Local Rule 6.3. Rule 60(b) exclusively governs final judgments, meaning those that are sufficiently final that they may be appealed, and it is therefore inapplicable to this Court's Order denying in part and granting in part Defendants' motion for summary judgment, which is non-final, interlocutory, and non-appealable. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 99 F.3d 538, 541 (2d Cir. 1996) ("By its own terms, Rule 60(b) applies only to judgments that are final."); *United States v. 228 Acres of Land & Dwelling*, 916 F.2d 808, 811 (2d Cir. 1990) (citation omitted) ("An order that denies summary judgment or grants partial summary judgment cannot by itself be the basis for an appeal, since it is nonfinal."). The motion for reconsideration is also not governed by Rule 59(e) because that rule is used to alter or amend a "judgment." Rule 54 of the Federal Rules of Civil defines "judgment" as "a decree and any order from which an appeal lies." *See also Kittay v. Korff (In re Palermo)*, No. 08-CV-7421 (RPP), 2011 U.S. Dist. LEXIS 11681, at *12 (S.D.N.Y. Feb. 4, 2011) ("Because a denial of a motion to dismiss is an interlocutory order from which no appeal lies . . . a motion pursuant to 59(e) to modify this order is procedurally improper . . . [and] the only ground available for [defendant] to move for reconsideration is under Local Civil Rule 6.3."). Accordingly, this motion for reconsideration is considered as brought pursuant to Local Rule 6.3.

(2d Cir. 2000) (courts may extend time-limit imposed by Local Rule 6.3); (Doc. No. 167). Accordingly, Plaintiffs' argument that the motion for reconsideration is untimely fails entirely.

   2. Pellegrini

Defendants argue that the R&R overlooked whether Pellegrini's termination was caused by her protected speech. To establish a First Amendment retaliation claim, a public employee must demonstrate the following: (1) the employee spoke "as a citizen upon matters of public concern"; (2) he suffered an adverse employment action; and (3) "the speech at issue was a substantial or motivating factor in the adverse employment action." *Benvenisti v. City of N.Y.*, No. 04-CV-3166 (JGK), 2006 U.S. Dist. LEXIS 73373, at *21–22 (S.D.N.Y. Sept. 23, 2006) (citations and internal quotation marks omitted); *see also Healy v. City of N.Y.*, No. 04 Civ. 7344 (DC), 2006 U.S. Dist. LEXIS 86344, at *11–12 (S.D.N.Y. Nov. 22, 2006). Defendants argue that summary judgment is warranted because Pellegrini, the former Acting Director of OHIA, failed to provide evidence sufficient to show that County officials knew of her protected speech with co-workers, outside counsel for OHIA, and her friends, including a former police chief, his wife, and his daughter. (Defs.' Mem. in Supp. of Mot. for Recons. ("Defs.' Br.") at 10–11.) Defendants, however, fail to acknowledge that they made precisely the same argument in their original motion for summary judgment. (*See* Defs.' Mem. in Further Supp. of Mot. for Summ. J. at 2.) Indeed, such an admission would undermine the very basis for their motion for reconsideration, which shall "not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.

Rather, in what appears to be a weak end-run around a previously litigated issue, Defendants couch their argument using the familiar buzz-words on reconsideration, that is, that the R&R "overlooked" the issue of causation. (Defs.' Br. at 11.) Specifically, Defendants

5

contend that the R&R does not include "any finding that Defendants were aware of [Pellegrini's] communications [with co-workers, outside counsel, and friends] and that her termination resulted therefrom." (*Id.* at 10.) This Court finds itself somewhat puzzled by this argument. The R&R, after engaging in significant analysis of the record and relevant case law, clearly states that "*based on the evidence submitted*, sufficient questions of fact exist with respect to whether or not Pellegrini's termination was motivated by her speech, particularly since Pellegrini's speech and termination all occurred within a period of six months." (R&R at 29–30 (emphasis added).) Defendants' argument in support of reconsideration as to Pellegrini reflects either a misreading of the R&R, which clearly and adequately addressed the issue of causation, or an attempt to take "a second bite at the apple." *Sequa Corp.*, 156 F.3d at 144. Either way, Defendants' motion for reconsideration is DENIED as to Pellegrini.

3. Williams

Defendants argue that the Second Circuit's decision in *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010), which interpreted *Garcetti v. Ceballos*, 547 U.S. 410 (2006), invalidates the analysis in the R&R as to whether Williams' speech was protected by the First Amendment. Only two examples of Williams' speech are arguably protected by the First Amendment:[3] first, he reported his belief to Defendant Cancellieri that various Nassau County employees were working out of title in violation of the Civil Service Laws, and second, he testified before the Nassau County Legislature about Civil Service procedures. The R&R considered only the first instance and did not discuss the second. For the reasons set forth below, under *Garcetti*, *Weintraub*, and their progeny, none of Williams' speech is protected by the First Amendment, and Defendants' motion for reconsideration is granted as to Williams.

---

[3] The R&R found that Williams' remaining statements, which were made to the Civil Service Commissioners, to whom he unquestionably owed a reporting duty, "were made pursuant to his official duties as Executive Director and undeserving of First Amendment protection." (R&R at 24.) This Court agrees.

6

*a. First Amendment Retaliation – Garcetti, Weintraub, and Progeny*

The standard for determining whether the speech of a public employee is protected by the First Amendment "entails two inquiries: (1) whether the employee spoke as a citizen on a matter of public concern and, if so, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (citations and internal quotation marks omitted). Here, Defendants ask this Court to reconsider the question of whether, in the instances relevant to this case, Williams spoke as a citizen or a public employee. (Defs.' Br. at 8.) "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. "The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" *Weintraub*, 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424)). The Second Circuit in *Weintraub* noted that "[t]he *Garcetti* Court cautioned courts against construing a government employee's official duties too narrowly." *Id.* (explaining that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes" (quoting *Garcetti*, 547 U.S. at 424–25)).

In determining whether a plaintiff spoke as an employee or a citizen, courts must consider factors such as whether the speech was made "in furtherance of" the plaintiff's "core [employment] duties" and whether the form of the speech had a "relevant citizen analogue." *Id.*

at 203. Neither factor is dispositive. *Id.* at 204; *see also Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 179 (E.D.N.Y. 2010). Rather, these factors serve as proxies for the controlling question of what "role the speaker occupied when he spoke." *Jackler v. Byrne*, 708 F. Supp. 2d 319, 324 (S.D.N.Y. 2010) (citing *Weintraub*, 593 F.3d at 204). Accordingly, "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203.

"'The inquiry into the protected status of speech is one of law, not fact.'" *Benvenisti*, 2006 U.S. Dist. LEXIS 73373, at *24 (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)); *see also Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009) ("To determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.' If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" (quoting *Garcetti*, 547 U.S. at 418)).

### b. Williams' Conversations With Defendant Cancellieri

As the Executive Director of the Nassau County CSC, Williams' official role was to advise the Civil Service Commission on civil service matters, to implement the policies made by the three commissioners, to assure that those policies were enforced and put into operation, and to handle day-to-day operations of the commission staff. (R&R at 3; Defs.' R. 56.1 Stmt.¶ 4; Pls.' Reply to Defs.' 56.1 Stmt. ¶ 4.)[4] Moreover, "[i]t is undisputed that Williams' responsibilities as Executive Director of the CSC included enforcing the rules and regulations

---

[4] "While the Commission is the final decision maker with respect to civil service transactions for all municipal agencies under its jurisdiction, the Commission relies upon the guidance, advice and information reporting of its Executive Director." (Pls.' Reply to Defs.' 56.1 Stmt. ¶ 5.)

governing civil service employees and investigating any suspected wrongdoing." (R&R at 24); (*see also* Doc. No. 134-1 at 4 (Williams testified that "the [Civil Service] commissioners are sort of like the board of directors of a corporation. The executive director is like the president. The executive director handles the day-to-day operations of the commission . . . ."); (Williams Dep. at 65.).) Indeed, Plaintiffs admit that, "as the Executive Director of the Civil Service Commission," Williams was "bound to ensure" that all Nassau County government agencies and departments complied with the Civil Service Law. (Pls.' R. 56.1 Cntrstmt. ¶ 21.) Thus, Plaintiff was responsible for correcting situations in which employees at various Nassau County government agencies were working out of title, as in the Treasurer's Office, or out of compliance with Civil Service Law, as in the Planning Department. (*Id.* ¶¶ 21, 36–44, 62–72.) The CSC requires cooperation from the various Nassau County agencies and officers subject to Civil Service Law so that it can address the personnel transactions governed by Civil Service Laws, Rules, and Regulations. (Pls.' Reply to Defs.' 56.1 Stmt. ¶ 6.)

While he served as Executive Director of the CSC, Williams told Defendant Cancellieri, the Deputy County Executive of Nassau County, he was concerned that employees in the Planning Department, the OHIA, and the Treasury Department were working out of title in violation of the Civil Service Laws. (R&R at 10, 12; Defs.' R. 56.1 Stmt. ¶¶ 43–44; Pls.' Reply to Defs.' 56.1 Stmt. ¶¶ 43–44.) Williams further advised Cancellieri that this arrangement could potentially constitute a misuse of federal funds. (R&R at 12.) The County Executive is an elected official who serves as the head of Nassau County government. Nassau County Charter § 201. According to the Nassau County Charter, "the Civil Service Commission [has] . . . the powers and duties of a municipal civil service commission," and it is "the duty of the County Executive to supervise, direct, and control, subject to the provisions of the act, the administration

9

of all departments, offices and functions of the county government . . . ." *Id.* §§ 203-1, 1303. The County Executive has "the powers and duties, with reference to the County Civil Service Commission, of the mayor of a city." *Id.* § 1303. The Deputy County Executive is appointed by the County Executive, and is responsible for performing the administrative duties of the County Executive, as well as other duties determined by the County Executive. *Id.* §§ 203, 205.

Williams was required to report only to the three Civil Service Commissioners, and owed no reporting responsibility to Cancellieri. (R&R at 24.) The R&R took this to be a controlling fact, citing the district court opinion in *Weintraub* for the proposition that when an when a public employee "goes outside of the established institutional channels in order to express a complaint or concern, the employee is speaking as a citizen, and the speech is protected by the First Amendment." (R&R at 25 (citing *Weintraub v. Bd. of Educ.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007), *aff'd*, 593 F.3d 196 (2d Cir. 2010).) The R&R applied this principle to hold that because "Williams had no duty to report any concerns he may have had to Cancellieri, his actions in doing so were taken as a private citizen and not as a public employee." (*Id.*) The Second Circuit's decision in *Weintraub* puts a finer point on this reasoning.

*Weintraub* and its progeny make clear that merely reporting information outside the chain of command is not necessarily sufficient, in and of itself, to establish that a public employee was speaking as a citizen. *See, e.g.*, *Carter v. Inc. Vill. of Ocean Beach*, No. 10-CV-0740, 2011 U.S. App. LEXIS 5464, at *5 (2d Cir. Mar. 18, 2011) (finding that plaintiffs were speaking pursuant to their official duties where their "allegations establish no more than that they reported what they believed to be misconduct by a supervisor up the chain of command – misconduct they knew of only by virtue of their jobs as police officers and which they reported as 'part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties.'" (citing *Weintraub*,

10

593 F.3d at 203)); *Anemone*, 629 F.3d at 115–16 (rejecting argument that speech was made as a private citizen, rather than pursuant to official duties, where plaintiff "went outside the chain of command"); *Castro*, 739 F. Supp. 2d at 180 (holding that a security guard was speaking as a public employee when he "directed his complaints up the operational chain of command"); *accord Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[W]e have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command.").

*Garcetti* and *Weintraub* require courts to take a practical approach to determining whether public employees have spoken pursuant to their official duties. For example, in *Castro*, the plaintiff's duties as a private security guard included enforcing school parking regulations, and the court found that his complaints to the school principal, as opposed to his employer, a private contractor, about laxity in the enforcement of parking regulations were made pursuant to his official duties. 739 F. Supp. 2d at 179 & n.20. Likewise, in *Morey v. Somers Cent. Sch. Dist.*, the plaintiff was head custodian of a high school who reported the possible existence of asbestos in the school gymnasium. No. 06-CV-1877 (PGG), 2010 U.S. Dist. LEXIS 26262, at *19–23 (S.D.N.Y. Mar. 19, 2010), *aff'd*, 2011 U.S. App. LEXIS 2554 (2d Cir. Feb. 9, 2011). Although the custodian's official duties did not include identifying or abating asbestos, the court held that his warnings about asbestos were sufficiently related to school maintenance and cleaning that he was speaking as a public employee and not as a regular citizen. (*Id.*)

Here, too, Williams' discussions with Cancellieri were in furtherance of his core official duties. Williams contacted Cancellieri, the Deputy County Executive, in order to solicit Cancellieri's help in ensuring that various Nassau County agencies and departments were in

11

compliance with Civil Service Laws, one of Williams' core job duties as Executive Director of the CSC. (Pls.' R. 56.1 Cntrstmt. ¶¶ 7, 38.) Even Plaintiffs admit that for the Nassau County government to run and for Williams to carry out his responsibilities, Williams necessarily had to, and did, interact regularly with other Nassau County government officials. (Pls.' Reply to Defs.' R. 56.1 Stmt. ¶ 6.) In addition to meeting with Cancellieri at regularly scheduled senior staff meetings, Williams met with Cancellieri and others "probably ten or twelve" times in eleventh months, and provided them with advice concerning Civil Service regulations. (Pls.' Reply to Defs.' R. 56.1 Stmt. ¶ 22; Doc. No. 130 ¶¶ 77–79.) Plaintiff also testified that he had "probably" at least twenty phone conversations with Cancellieri about various Civil Service issues. (Williams Dep. at 247.) This undisputed evidence demonstrates that it was not unusual for Williams to discuss Civil Service issues with Cancellieri on an official basis. Moreover, pursuant to the Nassau County Charter, the County Executive, as head of Nassau County government, and his deputies, including Cancellieri, have a direct relationship with the CSC, *see* Nassau County Charter § 1303 (the County Executive has "the powers and duties, with reference to the County Civil Service Commission, of the mayor of a city"), and it is the "duty of the Civil Service Commission to . . . do everything in its power to secure observance of the spirit and letter of the civil service law." *Id.* § 1309. For both the County Executive and the CSC to carry out their mandated duties under the Nassau County Charter, the two necessarily rely on and regularly interact with one another. Not only was this symbiotic relationship mandated, but it was carried out in the day-to-day operations of Nassau County Government as evidenced by the undisputed facts in the record.

Although he had no duty to report information to Cancellieri, in his role as Executive Director of the CSC, Williams relayed to Cancellieri his "concerns about the County's unlawful

actions, including compliance by various departments (*i.e.*, the Treasurer) with Civil Service Laws, Rules and Regulations," issues at the core of his job duties. (Pls.' R. 56.1 Cntrstmt. ¶¶ 21, 38 ("as the Executive Director of the Civil Service Commission" Williams was "bound to ensure" that Nassau County agencies and departments complied with the Civil Service Laws)). As the County Executive supervises, directs, and controls all Nassau County departments and agencies, it is entirely unremarkable that Williams would contact him on an official basis to discuss Civil Service violations in various agencies and departments. Indeed, by reporting the lack of compliance with Civil Service requirements to the Deputy County Executive, Williams was "was fulfilling his undisputed duty to see that those" requirements were satisfied. *See Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009).[5]

Moreover, the way in which Williams reported his concerns to Cancellieri has no citizen analogue, or "channel of discourse available to non-employee citizens." *Weintraub*, 593 F.3d at 204. While citizens may write letters to, or request meetings with, the Deputy County Executive, none would have the kind of access to Cancellieri that Williams had as Executive Director of the CSC. *See D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 354 (S.D.N.Y. 2010) (noting that plaintiffs' statements were "made *in a manner* that would not be available to a non-public employee citizen") (emphasis added); *see also Medina v. Dep't of Educ. of N.Y.*, No. 10-CV-1180 (BSJ), 2011 U.S. Dist. LEXIS 5194, at *8–9 (S.D.N.Y. Jan. 14, 2011) (plaintiff guidance counselor who complained to principal, union representative, and students' parents "was only in a position to raise these concerns to these specific people as a direct result of his position as a

---

[5] Although Williams also told Cancellieri that the arrangement involving these Civil Service violations might constitute a misuse of federal funds, such statements are equally related to his core job duties that he conveyed them as Executive Director of the CSC. *See, e.g., Morey*, 2010 U.S. Dist. LEXIS 26262, at **19–23 (janitor, whose duties did not include identifying asbestos, was speaking as a public employee when he reported asbestos to school principal because asbestos identification was sufficiently related to maintenance of school grounds). Moreover, it is clear that Williams learned of this potential "misconduct . . . only by virtue of [his] job[]" as Executive Director of the CSC. *Carter*, 2011 U.S. App. LEXIS 5464, at *5.

13

guidance counselor"); *Heffernan v. Straub*, 612 F. Supp. 2d 313, 326 (S.D.N.Y. 2009) (holding plaintiff made speech pursuant to his official duties when "an ordinary citizen not employed by the Fire Bureau would not . . . have the opportunity to convey [his opinion] through the channels that he utilized." (citing *Garcetti*, 547 U.S. at 422 ("Contrast, for example, the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day."))). Williams and Cancellieri met in person ten-to-twelve times, and spoke on the phone on least twenty occasions, to discuss civil service issues, and nothing in the record suggests that Williams ever spoke to Cancellieri on an unofficial basis. In sum, on the basis of the uncontroverted facts in the record, this Court concludes as a matter of law that Williams' conversations with Cancellieri are not protected by the First Amendment because Williams was speaking "pursuant to [his] official responsibilities." *Garcetti*, 547 U.S. at 424.

Tellingly, in their opposition to the motion for reconsideration, Plaintiffs do not dispute Defendants' contention that, under *Garcetti* and *Weintraub*, Williams spoke with Cancellieri in his official capacity, choosing instead to focus instead on Williams' statements to the Nassau County Legislature. The Court turns next to this issue.

      c. *Williams' Testimony Before the Nassau County Legislature*

Williams' testimony before the Nassau County Legislature ("Legislature") is also not protected by the First Amendment because Williams was speaking there in his official capacity as Executive Director of the CSC. Although Williams offered his testimony to the Legislature on the rules of a government agency – likely a matter of public concern – "[t]he fact that the plaintiff's speech addresses a matter of public concern is not dispositive." *Morey*, 2010 U.S. Dist. LEXIS 26262, at *19 n.7. To receive First Amendment protection, a public employee must

both "speak as a citizen, and . . . speak on a matter of public concern." *Castro*, 739 F. Supp. 2d at 179. Williams' testimony before the Nassau County Legislature fails to meet the first requirement, and is therefore not protected by the First Amendment.

The circumstances and content of Williams' testimony at the hearing indicate that he was speaking in his official capacity as Executive Director of the CSC.[6] The hearing occurred on a Monday at 3:20 p.m., in the middle of a workday. (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 1.) Williams addressed the Legislature on a technical question of Civil Service law before a public comment portion of the hearing commenced. The Chairwoman opened the hearing by announcing that there would be "a half hour of public comment . . . [with] each speaker having three minutes." (*Id.* at 7.) The Chairwoman, however, explained to the audience that the Legislature would first hear testimony from Williams: "I know most people are here for one particular issue but I would first like to call on Tom Williams, is he in the audience? Tom, who is just gonna clarify something for the Legislature that came up on both Finance and Rules, Tom?" (*Id.*) When this statement is considered with other undisputed facts in the record, it is clear that the Legislature offered Williams an opportunity to answer a civil service question that had been posed in a prior session by a legislator in response to official testimony provided by members of the Nassau County administration. (Pls.' Mem. of Law in Opp. to Defs.' Mot. for Recons. Ex A, at 1 ("Williams proceeds to declare prior testimony from members of the

---

[6] Plaintiffs object to Defendants use of the legislative hearing transcript on the grounds that it was "not before the Court during the Summary Judgment Motion . . . and was never presented until now." (Doc. No. 177.) Plaintiffs are simply wrong. Defendants attached the legislative hearing transcript to an affidavit in support of their motion for summary judgment on December 12, 2007. (Doc. No. 134-3.) Indeed, the R&R includes a citation to the very document that Plaintiffs now seek to preclude on the basis of surprise and prejudice. (R&R at 6 n.4.) Moreover, it stretches the imagination to believe that Plaintiffs could be prejudiced or surprised by a public document that recorded verbatim the *very statements* upon which they claim First Amendment protection. The Court is also troubled that Plaintiffs would suggest that Defendants be sanctioned for citing this document when they are at fault for misunderstanding the record in this case. For these reasons, Plaintiffs' motion to strike reference to the legislative hearing transcript is DENIED.

15

administration – testimony that he did not hear – 'wrong,' among other descriptors.").)[7] In other words, Williams, who was on the clock working as a public official, was permitted to speak on an official matter before the start of the public comment phase of the hearing.[8]

Plaintiffs rely heavily on the fact that Williams himself approached the Legislature. Williams explained his presence at the hearing as follows: "I was coming by here [sic] today to visit with some of my friends when I was informed there had been some questions concerning Civil Service regulations and the Office of Emergency Management. I was also informed of some of the answers which I do not believe were entirely accurate and I wanted to make myself available. I stayed there about an hour or so to make myself available to answer the questions that were being asked earlier so that you can have the correct and full information." (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 8.) Williams was informed about the Legislature's Civil Service questions by an unnamed "friend and colleague." (Pls.' R. 56.1 Cntrstmt. ¶ 91.) Notwithstanding the circumstances in which Williams found himself in the legislative chamber, it is evident that the reason the Legislature permitted him to correct prior testimony of Nassau County officials regarding the Civil Service Laws, which had been provided on an official basis, was that he was a high-level, Nassau County Civil Service official with specialized knowledge of

---

[7] Plaintiffs make much of that fact that Defendant Gianelli, a Deputy County Executive, was angered that Williams spoke in front of the Legislature. (Pls. Opp. to Mot. for Recons. at 8–9.) However, "'[i]t would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties.'" *Anemone*, 629 F.3d 97, 116 (quoting *Thompson v. Dist. of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008)).

[8] Indeed, the legislator who "was asking the questions" during the prior session with Nassau County officials asked whether Williams would consider meeting in private after the hearing because members of the public had "been waiting here all day to speak." (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 8.) Williams responded that he "wanted to let the entire Legislature know the answers." (*Id.*) The legislator then asked the Chairwoman if they should "do this now" and she responded that Williams should try to be as "quick[]" as possible. (*Id.*) Were Williams speaking as a public citizen, it seems likely that he unquestionably would have received the three minutes allotted to all other members of the public, and the legislators would not have debated whether he should provide the information *in private* or at another time. Moreover, this conclusion is further supported by the fact that, after Williams finished speaking, the Chairwoman immediately addressed "the people I'm looking out at in the audience," or her constituents, and started giving a political speech. (*Id.* at 11.) It is reasonable to conclude that the public comment phase of the Legislative Hearing began at this moment.

the Civil Service Laws. In this context, Williams' clarification of official testimony has no citizen analogue, or "channel of discourse available to non-employee citizens." *Weintraub*, 593 F.3d at 204; *see also Almontaser v. N.Y. City Dep't of Educ.*, No. 07-CV-10444 (SHS), 2009 U.S. Dist. LEXIS 84696, at *8–9 (S.D.N.Y. Sept. 1, 2009) (interim school principal spoke pursuant to official duties during interview with the press). Williams' speech is indisputably related to overseeing the operations of the Civil Service Commission, one of his central duties. (R&R at 3; Defs.' R. 56.1 Stmt. ¶ 4; Pls.' Reply to Defs.' R. 56.1 Stmt. ¶ 4.) Such an opportunity to provide technical advice to the Nassau County Legislature on Civil Service rules and procedures does not exist for citizens generally. Moreover, it would be unreasonable to infer that the Legislature asked Williams to provide guidance on the Civil Service regulations in his personal capacity, as opposed to his official capacity, when his core official duty is to interpret and enforce those very regulations. *See* Nassau County Charter § 1309 (it is "the duty of the County Civil Service Commission to make investigations concerning the enforcement and effect of this article, and to do everything in its power to secure observance of the spirit and letter of the civil service law"); (*see also* Pls.' R. 56.1 Cntrstmt. ¶ 21). In short, the undisputed evidence in the record clearly shows that Williams testified before the Legislature in his role as Executive Director of the CSC, and that there is no citizen analogue for the provision of such testimony. *See Weintraub*, 593 F.3d at 203 ("'When a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees.'" (quoting *Garcetti*, 547 U.S. at 424)).

Williams testimony was also "in furtherance" of his "core duties" as Executive Director of the CSC. *Weintraub*, 593 F.3d at 203. In explaining to the Legislature how title and appointment procedures work, Plaintiff addressed "questions concerning Civil Service

regulations and the Office of Emergency Management." (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 8–10.) As Plaintiffs acknowledge, the CSC "assist[s] Nassau County government and its municipal agencies by providing guidance, information, and assistance on how to comply with Civil Service Law." (Pls.' R. 56.1 Cntrstmt. ¶ 9.) Moreover, "as the Executive Director of the Civil Service Commission," Williams was "bound to ensure" that all Nassau County government agencies and departments complied with the Civil Service Law. (Pls.' R. 56.1 Cntrstmt. ¶ 21.) It is apparent from the hearing transcript that Williams believed that the Legislature had received an inaccurate account of the rules, and he felt it incumbent upon himself to put forth his 'expert' perspective, which is indeed "'part-and-parcel' of his concerns" about "properly execut[ing] his duties." *Weintraub*, 593 F.3d at 203 (citation and internal quotation marks omitted); *see Castro*, 739 F. Supp. 2d at 179 (noting that in deciding whether speech was made pursuant to official duties courts may consider "whether the speech resulted from special knowledge gained through the plaintiff's employment" (citation omitted)). The fact that Williams was not required to speak to the Legislature is not dispositive. *Weintraub* 593 F.3d at 203 (speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer").

Williams did not provide his personal opinion on any matter at the hearing, and was clearly addressing technical matters under the CSC rules and regulations as he attempted to answer the legislator's question. Indeed, when the legislator's question concerned funding for the Office of Emergency Management, and not Civil Service titles and appointments, he responded, "[T]hat's not a Civil Service question, I apologize. I was told it was a Civil Service

18

question." (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 10–11.)[9] As *Garcetti* and *Weintraub* require courts to consider the question of employment duty holistically, this Court finds that Williams testified before the Nassau County Legislature in furtherance of his official duties. *See Weintraub*, 593 F.3d at 202 ("The *Garcetti* Court cautioned courts against construing a government employee's official duties too narrowly.").

In sum, given the uncontroverted facts in the record, and drawing all inferences in favor of Plaintiffs, this Court finds as a matter of law that Williams' speech to the Legislature "owes its existence to [his] professional responsibilities" as Executive Director of the CSC. *Garcetti*, 547 U.S. at 424–25. No reasonable juror could find that Williams was speaking as a citizen in any of the instances detailed in the record. Accordingly, the First Amendment does not protect his speech, and Defendants motion for reconsideration as to Williams' First Amendment retaliation claims is GRANTED.

---

[9] Although Williams was unable to provide the necessary information – the issue was not about the Civil Service rules, as he had believed – the legislator thanked him and said he planned to write a letter to the County Attorney, the Comptroller or the Treasurer to get the necessary information. (Defs.' Reply in Supp. of Mot. for Recons. Ex. A, at 11.) Williams' responded, "Good. We just wanted to clarify the fact that you're correct." (*Id.*) The "we" to whom William is referring is clearly the CSC, his employer. Indeed, earlier in his testimony, when Williams explained the process by which civil service titles are approved, he also referred to the Civil Service Commission as "we." (*Id.* at 9 ("*We* pass them as noncompetitive titles but that is subject to Albany's review and Albany may, if they choose, make it a competitive title." (emphasis added).) This lends further support to the notion that Williams was speaking as a public official and not as a regular citizen.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for reconsideration (Doc. No. 170) is GRANTED as to Plaintiff Williams' First Amendment retaliation claims, and DENIED as to Plaintiff Pellegrini's First Amendment retaliation claims. As these First Amendment claims constitute Plaintiff Williams' only remaining claims, Williams Complaint is now dismissed in its entirety. The parties are ordered to file a Joint Status Report by April 15, 2011 as to Plaintiff Pellegrini's remaining claims.

SO ORDERED.

Dated: Brooklyn, New York
March 30, 2011

/S/
_____
ROSLYNN R. MAUSKOPF
United States District Judge